J-A11024-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| NICOLE M. LLOYD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER M. LLOYD | : | |
| | : | |
| Appellant | : | No. 14 MDA 2024 |

Appeal from the Order Entered November 28, 2023
In the Court of Common Pleas of Franklin County
Civil Division at No: 2021-00012

BEFORE: BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.: **FILED: JULY 22, 2024**

Christopher M. Lloyd ("Father") appeals from the November 28, 2023 order that denied his petition to modify custody and maintained the existing custody order of August 27, 2021 ("existing custody order"), with respect to his children with Mother, Nicole M. Lloyd ("Mother"); the parties' twelve-year-old daughter, M.E.L., born in November of 2011, and eight-year-old son, V.C.L., born in June of 2015 (collectively, "the Children"). After review, we affirm.

Father and Mother are the biological parents of the Children, who were born of their marriage. Following the parties' separation, Mother commenced the underlying custody action in January of 2021. As the trial court aptly stated:

> . . . Following [an] August 17, 2021 custody trial, [the trial c]ourt entered [the existing custody order] that granted [Mother]

primary physical custody and [Father] partial physical custody every Wednesday after school until Thursday morning and alternating weekends during the school year. The parties also shared the summer custody schedule on a two-week on, one-week off basis in Father's favor.[1] Said custody schedule remained undisturbed until Father filed a [p]etition for [m]odification on January 24, 2023[,] wherein Father sought shared physical custody. . . .[2]

Order and Opinion, 11/28/23, at 1.

Subsequent to an unsuccessful conciliation, the court held a custody trial on November 13, 2023. Father and Mother were both in attendance and testified on their own behalf. Additionally, Father presented the testimony of his girlfriend, Ashley Bragg. Mother presented the testimony of the parties' former co-parent counselor, Deann Blankenship Sanders. The court also separately interviewed the Children, *in camera*, in the presence of counsel.

During the subject proceeding, Father requested a 50-50 shared physical custody schedule throughout the entire year. Specifically, Father requested shared physical custody with exchanges to occur on Friday after school or at 5:00 p.m. year-round. **See** N.T., 11/13/23, at 56-57; **see also**

---

[1] The existing custody order awarded the parties shared legal custody. **See** Order, 8/27/21. Because the parties do not challenge this aspect of the existing custody order, we do not address it in the instant writing.

The existing custody order additionally included, *inter alia*, a right of first refusal provision, which Father exercised on occasions when Mother travelled for work. **See** Order, 8/27/21; **see also** N.T., 11/13/23, at 22-23.

[2] In the interim, Father filed a petition for special relief on August 25, 2022, resulting in an order the following day, related to the timing of the commencement of the school-year schedule.

Father's Exhibit 14 (proposed order). Mother, however, sought to maintain primary physical custody during the school year and to exercise a 50-50 physical custody schedule during the summer. ***See id.*** at 147, 187 ("In general terms, I'm asking that the school schedule remain similar to what it is today, on a primary schedule for me, and [Father] receiving Wednesdays and every other weekend. . . . And then, in the summer, to switch to more of [an equitable split], to better benefit the kids. . . .").[3]

When interviewed, the Children expressed a desire to spend more time with Father and a preference for a 50-50 shared custody schedule. ***See*** N.T., 11/13/23 (Child Interviews), at 13, 15, 17, 28-29. The Children recognized that an increase in time with Father would mean a reduction in time with Mother. ***See id.*** at 13, 29. Specifically, on this topic, M.E.L., then age twelve, testified as follows:

Q. Do you wish you could spend more time with your dad?

A. Yes.

Q. If you had a chance to tell me what you would like your relationship with your dad look like, could you tell me?

A. Just seeing him more often.

Q. Okay. What's more often?

A. Maybe a couple more days in the week.

_____

[3] Mother proposed a week-on week-off summer custody schedule, with Father's week extending to Monday morning. ***See*** N.T., 11/13/23, at 147; ***see also*** Mother's Exhibit 5 (proposed order).

Q. Okay. You realize that would involve taking time away from your mom?

A. Yes.

Q. How do you feel about that?

A. Kind of sad, but at the same time, I still want to see my dad.

. . .

Q. Can you tell me, you said you want to spend a couple extra days a week with your dad. Can you tell me the reasons that you have for that?

A. Just because having one day out of the week seeing him, like you could see like once a week because like I would have to wait until another Wednesday to see him.

Q. Mm-hmm. So you feel like it's a long period of time in between when you see him?

A. Yes.

. . .

Q. And the Judge was asking you about more time with dad and less time with mom and that sort of thing. What would your thoughts be on a schedule -- so, I think right now you spend more time with mom during the school year[,] but you spend more time with dad over the summer?

A. Yes.

Q. What would you think about like a schedule where you spend an equal amount of time with your mom and your dad throughout the year.

A. Yes, I'd prefer that.

*Id.* at 13, 15, 17.

Similarly, V.C.L., then age eight, testified:

Q. What are your feelings about spending more time with your dad?

A. I just want to spend more time with him.

Q. You do want to spend more time with him?

A. Mm-hmm.

Q. What -- in your mind, what would that look like?

A. Half of the time with dad and the other half with mom.

. . .

Q. . . . Why do you want to spend half the time with dad and half the time with --

A. Because we barely get to see dad.

Q. You do realize that if you spent half the time with your dad, then that's going to take away from the time you spend with your mom?

A. Yes.

Q. You would be okay with that?

A. Yes.

*Id.* at 28-29.

At the time, Mother continued to reside in Greencastle, Pennsylvania; Father continued to reside in Fayetteville, Pennsylvania. **See** N.T., 11/13/23, at 4, 147. The Children attended school in Greencastle, where they had attended school for two years, and were in sixth and second grades. **See id.** at 5-6, 25. By all accounts, M.E.L., was doing well in school. Conversely,

V.C.L. had an Individualized Education Program ("IEP") due to reported difficulties with reading and writing. *See id.* at 7-9, 101, 180.

M.E.L. participated in volleyball, Girl Scouts, and extra-curricular Spanish classes. V.C.L. participated in soccer and karate. *See id.* at 6, 148-150, 154-155. The Children also attended CCD classes. *See id.* at 155-156, 205. Mother testified that she was largely responsible for organizing the Children's extra-curricular activities. *See id.* at 149, 156-158. She further indicated that Father would withhold or withdraw the Children early from activities scheduled during his custodial time and/or requested that activities not be scheduled during his time. *See id.* at 150, 153-154 ("In general, [Father] has requested that I don't schedule anything on his days. And I get the feedback that if it's not something he agreed to, that he's not in favor of them doing it.").

Additionally, the Children were enrolled in an after-school karate program, which they had participated in the prior two school years. *See id.* at 25. Just prior to the 2023-2024 school year, Mother made alternate plans for M.E.L. to instead go to Mother's friend's home, as M.E.L. no longer enjoyed the program.[4] Because Mother's friend declined to accept M.E.L. during

---

[4] M.E.L. acknowledged her attendance at the after-school karate program one day a week, but explained as follows regarding her participation:

Q. Do you participate when you are there?

*(Footnote Continued Next Page)*

Father's custodial time, Father re-enrolled the Children, including M.E.L., in the karate program. *See id.* at 50-53, 85-86, 177-178, 210-214.

Mother further testified that she was responsible for scheduling and attending the Children's medical and dental appointments. She likewise scheduled the Children's therapy appointments, which she described as beneficial. *See id.* at 165-167, 170-172. According to Mother, such issues generally went ignored or unsupported by Father. *See id.* at 167-170, 172-173. Father however complained that Mother scheduled appointments unnecessarily and without his input. *See id.* at 30-34, 47-49, 65-74, 79-81. He further expressed his support for the Children's engagement in therapy. *See id.* at 76-79.

---

A. No.

Q. Why not?

A. Because I just don't want to do it. I don't want to be there.

. . .

Q. Okay. What do you do when you go to the dojo and you are not participating in karate?

A. I normally do stuff on my school iPad or my phone.

Q. Okay. Doing homework, playing games, little of both?

A. If I have homework, yes.

N.T., 11/13/23 (Child Interviews), at 5-6.

By order dated and entered November 28, 2023, the trial court denied Father's petition to modify the existing custody order and issued a contemporaneous opinion addressing the custody factors pursuant to 23 Pa.C.S.A. § 5328(a).

On December 27, 2023, Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Thereafter, on January 5, 2024, the trial court filed a responsive Rule 1925(a) opinion.

On appeal, Father raises the following issues for our review, which we re-order for ease of disposition:

I. Whether the trial court erred and abused its discretion by finding that custody factors 23 Pa.C.S.[A.] §§ 5328(a)(4), (a)(10) and (a)(12) favor Mother where the testimony and evidence at trial did not support the factual findings or legal conclusions?

II. Whether the trial court erred and abused its discretion by failing to give proper weight and consideration to the well-reasoned preference of the [C]hildren pursuant to 23 Pa.C.S.[A.] § 5328(a)(7) when it denied [Father]'s request to modify the schedule to a shared physical custody schedule where there is no support in the record for the basis the trial court cited for its failure to give weight and consideration to the preference of the [C]hildren?

Father's Brief at 3 (suggested answers omitted).

We review custody orders for an abuse of discretion. *See R.L. v. M.A.*, 209 A.3d 391, 395 (Pa. Super. 2019). We will not find such an abuse merely because we would have reached a different conclusion. *See id.* Rather, an abuse of discretion occurs only if the trial court overrode or misapplied the law

- 8 -

in reaching its conclusion, or the record shows the trial court's judgment was manifestly unreasonable or the product of partiality, prejudice, bias, or ill will. *See id.*

Moreover, our scope of review is broad. *See id.* Because this Court does not make independent factual determinations, however, we must accept findings of the trial court that are supported by competent evidence of record. *See S.C.B. v. J.S.B.*, 218 A.3d 905, 913 (Pa. Super. 2019). Importantly, we defer to the trial court on matters of credibility and weight of the evidence, as the trial court viewed and assessed witnesses firsthand. *See id.* We are not, however, bound by the trial court's deductions or inferences. *See id.*

"Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011) (quoting *A.D. v. M.A.B.*, 989 A.2d 32, 35-36 (Pa. Super. 2010)). As we stated in *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005), "It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." (quoting *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005)).

"When a trial court orders a form of custody, the best interest of the child is paramount." *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *M.J.N. v. J.K.*, 169 A.3d 108, 112 (Pa. Super. 2017). To that end, the Child Custody Act sets forth sixteen factors that a court must consider before making any custody determination. *See E.B. v. D.B.*, 209 A.3d 451, 460 (Pa. Super. 2019). "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* at 468 (quoting *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013)). The statutorily required factors are as follows:

**§ 5328. Factors to consider when awarding custody.**

**(a) Factors.** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In assessing these factors,

[a] trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." **S.W.D.**, [96 A.3d at 401]. **See also** 23 Pa.C.S.[A.] § 5323(a) and (d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M.**[, 63 A.3d at 336.].

**R.L.**, 209 A.3d at 395. While a child's preference is an important factor to be considered, it is not controlling. **Bovard v. Baker**, 775 A.2d 835, 840-841 (Pa. Super. 2001) (citing **McMillen v. McMillen**, 602 A.2d 845, 847 (Pa. 1992)) ("[W]hile a child's preference is not controlling, the preference does "constitute an important factor that must be carefully considered" in determining the child's best interests."). We further reiterate that the statute mandates that the court consider "all relevant factors, **giving weighted consideration to those factors which affect the safety of the child**." 23 Pa.C.S.A. § 5328(a) (emphasis added).

In the case *sub judice*, the trial court addressed and analyzed the custody factors pursuant to Section 5328(a). The court found that Section 5328(a)(4), (10), and (12) weighed in favor of Mother, and that Section 5328(a)(1), and (13) weighed in favor of Father. The court concluded that all other factors were neutral or not applicable. **See** Opinion and Order,

11/28/23, at 3-13.  Critical to the court's determination was the Children's stability.  *See id.* at 13.  The court stated,

> After applying the factors set forth in 23 Pa.C.S.[A. §] 5328(a), this [c]ourt finds that it is in the best interests of the [C]hildren for the current custody schedule to remain intact.  We find that the current school-year schedule provides the stability and continuity contemplated by § 5328[(a)](4), (5), (6) and the current summer schedule fosters the nurturing relationships contemplated by § 5328[(a)](10).

*Id.*

Specifically, with respect to the determinative factors, the court found as follows:

> [4.] The need for stability and continuity in the Children's education, family life and community life.
>
> For the past two years, Mother's primary physical custody has served as the parties' status quo, and, for this reason, the [C]hildren have grown accustomed to regular school schedules and extra-curricular activities.  The parties' olde[r] minor child, M.E.L., requires less stability and continuity than V.C.L., who is eight years old, due to M.E.L.'s maturity level and ability to adjust to new extra curriculars, such as volleyball. V.C.L., on the other hand, resists changes to his schedule, such as leaving karate early or trying new sports.  Accordingly, this factor weighs slightly in Mother's favor in regard to V.C.L., but not in regard to M.E.L.
>
> This court noted Father's willingness to transport the minor children to the Greencastle-Antrim School District, as well as Father's ability to arrive on time for the [C]hildren's school day and extra-curriculars.  However, we also heard credible testimony about Father's refusal to prioritize the [C]hildren's activities and Father's minimal efforts to find afterschool childcare, particularly with regard to M.E.L.  In the event we award the parties a week[-]on week[-]off custody schedule, this conundrum with the [C]hildren's after-school care would occur five times every[]other week.  Accordingly, were we to order shared physical custody, we find that Father has no plans for afterschool care for the [C]hildren, thereby impacting their stability and continued progress in their education and extra-curricular activities.

- 13 -

. . .

[10]. Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the Children.

Mother usually handles all the day-to-day needs of the [C]hildren, as Mother exercises primary physical custody. Father testified that V.C.L. missed eight days of school between December 2022 and April of 2023, which Mother attributed to appointments that could not be scheduled outside of school hours. Moreover, we are aware of Mother's attentiveness to the [C]hildren's medical needs, such as M.E.L.'s foot injury and allergy to an antibiotic.

However, testimony evidenced that Father also cares for the [C]hildren's day-to-day needs during his periods of partial physical custody, which includes his summer custody time. Although this court heard testimony that Father failed to get M.E.L. to urgent care when she had strep throat, Father's girlfriend credibly testified that the symptoms were not severe. We do take note that, according to Mother's testimony, Father ridiculed Mother for scheduling M.E.L.'s allergy appointment, despite M.E.L. having an allergy. Although Father's statements might not have amounted to "ridicule," this court finds that Father does not advocate for the [C]hildren's medical needs with the same preparedness as Mother.

In regard to the [C]hildren's educational needs, the parties appeared to disagree as to the timing of V.C.L.'s [IEP]. Mother wanted to immediately have [V.C.L.] tested for eligibility for an IEP after the parties met with the school principal, whereas Father wanted to wait until V.C.L. was older, relying on advice from the teachers and principal. While weighing these facts, we remain cognizant that V.C.L.'s educational needs are of high importance, as V.C.L. repeated kindergarten after the August 17, 2021 trial.

Finally, the parties differ in respect to the [C]hildren's need for mental health therapy, which the [C]hildren started after the parties' divorce. According to Mother's testimony, Father is hesitant to prolong the [C]hildren's therapy, focusing on when they can be released, whereas Mother intends to continue the therapy as long as it helps the [C]hildren. During M.E.L.'s interview, we witnessed her emotional breakdown as she discussed the parties' divorce and her need for therapy, and, as a

- 14 -

result, this court finds that discontinuing therapy is not in the best interest of M.E.L. Father's reluctance to continue the [C]hildren's therapy, when paired with Father's response to M.E.L.'s allergy appointment, causes this factor to weigh slightly in favor of Mother.

. . .

[12]. Each party's availability to care for the Children or ability to make appropriate child-care arrangements.

Both parties appear to have flexible work schedules when it comes to emergencies with the [C]hildren. Father credibly testified that he is able to rearrange his work schedule as needed, and Mother is usually available to exercise her primary physical custody. Mother did testify that, in the past, Maternal Grandparents have needed to care for the [C]hildren, but these occasions are small amounts of time; not overnights or entire weekends.

In the event Mother needs to go out of town, Father exercises his "right of first refusal." . . .

Father lives in Fayetteville, Pennsylvania and the [C]hildren attend school in Greencastle. If we were to order shared physical custody in the form of a week-on, week-off schedule, Father does not have any plans for the [C]hildren's after-school care, and, at the time of trial, the [C]hildren were attending karate until Father could drive to Greencastle, a solution that M.E.L. actively boycotts and explicitly dislikes. Without proposing any potential alternatives to this court, Father lacks initiative and forethought with the shared custody schedule. Accordingly, this factor weighs in favor of Mother.

Order and Opinion, 11/28/23, at 5-6, 8-11 (cleaned up).

To the extent Father argues in his first issue that the trial court's determinations with respect to the foregoing factors and the Children's stability were not supported by the record, *see* Father's Brief at 22-30, this is belied by Mother's testimony on direct examination, as follows.

- 15 -

Q. And based on the things we've just talked about, so the doctors, dentist, counseling, extracurriculars and schools, how do you see each of your roles the between you and [Father]?

A. I think that I still provide the stability and the primary care to make sure that they have all of the things that they need. Medical, physical, emotional, all that support that I see and I see that myself, being stability that they need.

And I see [Father] still providing the fun. They have a lot of fun with [Father]. They go to the beach during the summer. He takes them to do things and I think he's more the fun role to take them to do things and I make sure that the other pieces are all kept together.

N.T., 11/13/23, at 185.

Further, inasmuch as Father seeks this Court to re-find facts, re-weigh evidence, and/or re-assess credibility to his view of the evidence, this we cannot do. *See S.C.B.* 218 A.3d at 913 (reiterating that we defer to the trial court on matters of credibility and weight of the evidence, as the trial court viewed and assessed witnesses firsthand).

After careful review of the record, we determine that the court's factual findings are supported by the record, and the court's conclusions in light of those findings are reasonable. As such, we discern no abuse of discretion and do not disturb them. *See King*, 889 A.2d at 632.

In his second issue, Father presents the crux of his argument on appeal that the trial court abused its discretion by not finding determinative Section 5328(a)(7), the Children's well-reasoned preference. *See* Father's Brief at 17-21; 23 Pa.C.S.A. § 5328(a)(7). Father states, "The trial court's failure to give proper consideration to the well-reasoned preference of the [C]hildren

constitutes an abuse of discretion and reversible error because, when proper consideration is given to the well-reasoned preference of the [C]hildren, it is clear that a shared physical custody schedule is in the best interest of the [C]hildren."[5] *Id.* at 18. He contends that the court instead placed undue weight on Section 5328(a)(4), (10), (12), which "pale in comparison to the well[-]reasoned preference of the [C]hildren" and "do not rise to a level [of] trivializing the well-reasoned preference of the [C]hildren." *Id.* at 21, 23.

Father emphasizes that the Children were "unequivocal" in their preference for additional time with him. *See id.* at 18-19. Noting that M.E.L. "is in middle school, well[-]adjusted and almost a teenager," he further maintains that disregard of the Children's preference is inapposite to this Court's decision in *E.B. v. D.B.*, 209 A.3d 451 (Pa. Super. 2019), wherein we recognized, in part, "[A]s children grow older, more weight must be given to the preference of the child." Father's Brief at 21. In *E.B.*, in attributing weight to the preference of a fifteen-year-old child, we stated as follows:

> It has been said that an older teenage child is like an elephant – she sleeps wherever she wants. While the "Elephant Rule" is not incontrovertible, such as if a teenager's safety were at risk, or if the other factors strongly demonstrated that a teenager's preference was against her best interest, courts have to recognize the limitations of their power in determining where older

---

[5] Father additionally contends that the trial court's analysis of the Children's preference in its Rule 1925(a) opinion, noted *infra*, was based on the alleged improper premise that the Children's wish for more time with Father was rooted in their desire for an intact family. *See* Father's Brief at 19-21.

teenagers must reside. This is not a case where a teenager adamantly refused to spend time with one of her parents, but rather, where the teenager requested the time to be equally allocated. Furthermore, the trial court found Child, who was 15 years old at the time, to be mature and thoughtful in her desire to split her time equally between her parents.

*E.B.*, 209 A.3d at 468 (footnote omitted; citation omitted).

As to Section 5328(a)(7), in its opinion contemporaneous to the subject order, the trial court stated that it "conducted separate interviews with M.E.L. and V.C.L. with counsel for both parties present. While making its custody determination, statements made by the [C]hildren were taken into consideration by the [c]ourt."[6] Order and Opinion, 11/28/23, at 7. In its Rule 1925(a) opinion, the trial court acknowledged that the Children expressed a preference to spend more time with Father but noted the that it had to additionally give consideration to other factors, such as stability. *See* Trial Court Opinion, 1/5/24, at 3-4. The court stated,

[T]he [C]hildren love their father and they miss him and wish that they could go back to where they lived with him full time. However, in reaching this determination, we also understand that the basis for this feeling is a desire [] for Father, Mother and the [C]hildren to live as an intact family again. Confronted with the reality that this is not likely to occur, we also had to give weight

_____

[6] To the extent Father also assails the detail and specificity of the trial court's analysis set forth in its contemporaneous opinion, *see* Father's Brief at 19-20, this argument is without merit. As indicated *supra*, "[T]here is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *R.L. v. M.A.*, 209 A.3d 391, 395 (Pa. Super. 2019) (quoting *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013)).

to other factors that impact the [C]hildren's best interest, including factors involving stability in [the C]hildren's community lives, the ability to make appropriate child care arrangements, the proximity of the parties residences, and the ability or likelihood of the parent to attend to the [C]hild[ren]'s daily physical, emotional, developmental, educational and special needs. In this particular case and with the facts presented, we determined that these factors merited more weight than the preferences expressed by the [C]hildren. . . .

*Id.*

Because this issue, at its core, disputes the trial court's determinations regarding which statutory factors "are most salient and critical," it necessarily fails. *See E.B.*, 209 A.3d at 468. While a child's preference is an important factor, it is not controlling. *Bovard*, 775 A.2d at 840-841 (citing *McMillen*, 602 A.2d at 847).

Indeed, distinct from *E.B.*, the Children were only twelve and eight years old, and Mother testified as to their lack of maturity and struggles following the parties' divorce. *See* N.T., 11/13/23, at 148, 173-174, 178. Mother explained that M.E.L. "has been very closed since the divorce. It's -- she doesn't want to talk a lot about it, but her anxiety is high and she gets stressed." *Id.* at 173. Likewise, Mother explained that V.C.L. is "really struggling still that his parents are divorced and we are not living together." *Id.* at 174. Mother additionally acknowledged M.E.L.'s unpreparedness for an emergency and inability to stay home alone for an extended period of time. *See id.* at 178 ("[M.E.L.] has a strong fear of fire. . . . And so I feel like until she's a little bit more comfortable with just general things, like what happens

- 19 -

in an emergency, I don't think she's ready to stay alone."). Thus, we discern no error in the trial court finding determinative and affording greater weight to those factors affecting the Children's stability and continuity, rather than their preference. *See E.B.*, 209 A.3d at 468.

For the foregoing reasons, we affirm the trial court's order.

Order affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/22/2024